**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SUSAN G. MONROE,**

                **Plaintiff,**                  **7:10-cv-1259**
                                                                 **(GLS)**

             **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

                **Defendant.**
_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFF:**<br>Conboy, McKay Law Firm<br>Carthage Office<br>307 State Street<br>Carthage, NY 13619 | LAWRENCE D. HASSELER, ESQ. |
| **FOR THE DEFENDANTS:**<br>HON. RICHARD S. HARTUNIAN<br>United States Attorney<br>100 South Clinton Street<br>Syracuse, NY 13261<br><br>Steven P. Conte<br>Regional Chief Counsel<br>Social Security Administration<br>Office of General Counsel, Region II<br>26 Federal Plaza, Room 3904<br>New York, NY 10278 | PETER W. JEWETT<br>Special Assistant U.S. Attorney |

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

# I. **Introduction**

Plaintiff Susan G. Monroe challenges the Commissioner of Social Security's denial of her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), seeking judicial review under 42 U.S.C. § 405(g). (*See* Compl., Dkt. No. 1.) After reviewing the administrative record and carefully considering Monroe's arguments, the court dismisses the Complaint.

# II. **Background**

In April 2006, Monroe filed applications for DIB and SSI under the Social Security Act ("the Act"), alleging an onset date of July 2, 2003. (*See* Tr.[1] at 91-106.) After the applications were denied, Monroe sought reconsideration, and a hearing before an Administrative Law Judge (ALJ) was held on April 21, 2008. (*See id.* at 65, 79-83, 701-23.) On July 24, 2008, the ALJ issued an unfavorable decision and found that Monroe was not disabled. (*See id.* at 65-71.) At Monroe's request, the Appeals Council remanded the decision to the ALJ to further develop the record and obtain testimony from a vocational expert (VE). (*See id.* at 42-61.) A second administrative hearing was held on May 13, 2009. (*See id.* at 724-46.) On

---

[1] Page references preceded by "Tr." are to the Administrative Transcript. (*See* Dkt. No. 9.)

July 6, 2009, the ALJ issued an unfavorable decision again denying the benefits. (*See id.* at 12-22.) That decision became the final decision of the Commissioner when the Appeals Council denied Monroe's request for review. (*See id.* at 6-8.)

Monroe commenced the present action by filing her Complaint on October 20, 2010, wherein she sought review of the Commissioner's determination. (*See generally* Compl.) The Commissioner filed an answer and a certified copy of the administrative transcript. (*See* Dkt. Nos. 8, 9.) Each party, seeking judgment on the pleadings, filed a brief. (*See* Dkt. Nos. 10, 12.)

### III. <u>**Contentions**</u>

Monroe contends that the Commissioner's decision is tainted by errors of law and is not supported by substantial evidence. (*See* Dkt. No. 10 at 12-20.) Specifically, Monroe claims that the ALJ: (1) erred in failing to find that her leg edema, hand numbness, and musculoskeletal impairments constituted severe impairments; (2) incorrectly found that she could perform light work; (3) failed to adequately evaluate her credibility; and (4) erred in finding that there were a significant number of positions in the economy that she could perform. (*See id.*) The Commissioner counters that the

3

appropriate legal standards were used by the ALJ and her decision is also supported by substantial evidence.[2] (*See* Dkt. No. 12 at 4-10.)

### IV. Facts

The court adopts the parties' undisputed factual recitations. (*See* Dkt. No. 10 at 1-12; Dkt. No. 12 at 1-2.)

### V. Standard of Review

The standard for reviewing the Commissioner's final decision under 42 U.S.C. § 405(g)[3] is well established and will not be repeated here. For a full discussion of the standard and the five-step process by which the Commissioner evaluates whether a claimant is disabled under the Act, the court refers the parties to its previous opinion in *Christiana v. Comm'r of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-3 (N.D.N.Y. Mar. 19, 2008).

### VI. Discussion

### A. Severity Findings

Monroe contends that the ALJ erred in failing to find that her leg edema,

---

[2] "Substantial evidence is defined as more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (internal quotation marks and citation omitted).

[3] 42 U.S.C. § 1383(c)(3) renders section 405(g) applicable to judicial review of SSI claims.

hand numbness, and musculoskeletal impairments were severe.  (*See* Dkt. No. 10 at 12-51.)  The Commissioner argues that the ALJ's findings at step two of the sequential evaluation are supported by substantial evidence.  (*See* Dkt. No. 12 at 4-6.)

A finding of not severe is appropriate when an impairment, or combination of those impairments "does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a), 416.921(a).  The court will turn first to Monroe's musculoskeletal impairments.  The ALJ noted that Monroe "sought treatment for musculoskeletal pain in multiple areas, such as her back, neck, right hip, right shoulder, and knees.  However, x-rays and MRI scans show[ed] no more than mild abnormalities . . . leading the [ALJ] to conclude that [Monroe] d[id] not have a 'severe' musculoskeletal impairment."  (Tr. at 16.)  Monroe challenges the ALJ's findings, and argues that she suffered several injuries to her back.  (*See* Dkt. No. 10 at 14-15.)  Monroe further claims that these injuries resulted in a limited range of motion in her neck, shoulders, and back, and also a slowed gait which required a cane on occasion.  (*See id.*)

Although Monroe contends that her musculoskeletal impairments limited her ability to work, substantial evidence supports the ALJ's finding that

5

her injuries did not significantly impact her ability to perform basic work activities. As for Monroe's claims regarding limited range of motion, both state agency consultative examining physicians found few, if any, limitations in that area. Dr. Gerald R. Amatucci examined Monroe on November 5, 2003. (*See* Tr. at 250-53.) Dr. Amatucci found "excellent range of motion" in her cervical spine, "relatively good range of motion of her lumbosacral spine," "normal range of motion" in her shoulders, and "good range of motion of her hips." (*Id.* at 251-52.) Monroe was subsequently examined by Dr. James Naughten, on May 30, 2006. (*See id.* at 434-37.) Dr. Naughten found the following:

> "[c]ervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally . . . Lumbar spine shows flexion [eighty] degrees, full extension, full lateral flexion bilaterally, and fully rotary movement bilaterally . . . Full [range of motion] of shoulders, elbows, forearms, and wrists bilaterally. Hip flexion on the right is 90 degrees. Full [range of motion] of left hip."

(*Id.* at 436.)

Several medical sources also noted that Monroe experienced a normal gate. For example, Dr. Douglas Sloan, found in July 2003, that Monroe's "[g]ait was essentially normal, [she was] able to go up on the heel and toes without difficulty." (Tr. at 245.) Dr. Amatucci similarly found, in November

6

2003, that Monroe "had excellent tandem walking, heel/toe walking and could bend relatively well." (*Id.* at 252.) In October 2004, Rodney Richmond, Monroe's treating physician's assistant, noted that her "[g]ait [wa]s normal." (*Id.* at 334.) At Monroe's May 2006 consultative examination, Dr. Naughten stated that she "decline[d] walking on toes and ha[d] moderate difficulty walking on heels." (*Id.* at 435.) However, he also noted that she "[n]eeded no help changing for [the] exam." (*Id.*) A "[n]ormal steady gait" was again found in February 2009. (*Id.* at 679.)

Based on the foregoing, substantial evidence supports the ALJ's finding that Monroe's musculoskeletal impairments did not significantly limit her ability to perform basic work functions and were therefore not severe.

Turning next to Monroe's leg edema, the ALJ found that it was a non-severe impairment because it was "controlled with treatment" and had "not been shown to more than minimally affect [her] ability to engage in work activity." (Tr. at 17.) Substantial evidence supports this finding. At several points throughout the record, no edema was found. For example, in December 2003, Dr. John Jepma found Monroe's extremities to be free of "clubbing, cyanosis[4] [and] edema." (*Id.* at 275.) In September 2004,

---

[4] Cyanosis is defined as "a bluish discoloration, applied especially to such discoloration of skin and mucous membranes due to excessive concentration of reduced hemoglobin in the

7

Richmond similarly found that her extremities "show[ed] no edema." (*Id.* at 324.) Dr. Edmund Roache also noted "[n]o cyanosis, clubbing, or edema," in her extremities, in February 2006. (*Id.* at 369.) In May 2006, Dr. Naughten, a consultative physician, found "[n]o cyanosis, clubbing, or edema," in Monroe's extremities. (*Id.* at 436.) Richmond noted "no edema," in Monroe's extremities, in August 2006. (*Id.* at 500.) Sharen Yaworski, a nurse practitioner, also stated in July and September 2008, that Monroe's leg edema was "well controlled" by her medication. (*Id.* at 621, 624.) Accordingly, the court finds that substantial evidence supports the ALJ's determination that Monroe's leg edema was not severe.

Finally, with respect to Monroe's hand numbness, the ALJ noted that Monroe "ha[d] reported a loss of feeling in both hands, but no medically determinable impairment ha[d] been identified to explain this condition." (*Id.* at 17.) Monroe claims that she suffers from diabetes with peripheral neuropathy,[5] and that this has caused her hand numbness. (*See* Dkt. No. 10 at 14.) However, Monroe fails to cite to any evidence in the record that in fact establishes that her hand numbness resulted from her peripheral neuropathy.

---

blood." Dorland's Illustrated Medical Dictionary 410 (28th ed. 1994)

[5] The ALJ found that Monroe suffered from "type 2 diabetes mellitus . . . and ha[d] developed peripheral neuropathy of the *lower extremities* as a result of her diabetes." (Tr. at 16 (emphasis added).)

8

Instead, Monroe cites to an outside source, to support her claim that peripheral neuropathy "entails damage to the nerves peripheral to (beyond those which are connected to) [her] spinal cord, often resulting in numbness." (*Id.* at 14 (citing *Peripheral Neuropathy*, WebMD, http://www.webmd.com/brain/understanding-peripheral-neuropathy-basics (last visited Nov. 6, 2012)).) Thus, even assuming that peripheral neuropathy may cause hand numbness in some individuals, Monroe has not cited to any medical evidence from the record establishing that her medically determinable peripheral neuropathy did in fact cause her hand numbness.

Furthermore, several medical sources found that Monroe had no numbness, weakness, or paresthesia, and maintained good grip strength. For example, in August 2003, Dr. Sloan found that Monroe had "[n]o numbness, weakness or paresthesias in [her] upper or lower extremities." (Tr. at 247.) Dr. Amatucci similarly found, in November 2003, that Monroe "had excellent range of motion of her wrists and hands. No areas of tenderness, erythema, edema, warmth or deformity. Her grip strength was normal at 5/5 bilaterally." (*Id.* at 251.) In October 2004, despite complaining to her treating physician's assistant of "heaviness in her arms," Dr. Rodney was unable "to re-produce any weakness in her upper extremities." (*Id.* at

9

333-34.) Dr. Naughten also found that Monroe's "[h]and and finger dexterity [was] intact" and her "[g]rip strength [was] 5/5 bilaterally" in May 2006. (*Id.* at 436.) Accordingly, substantial evidence supports the finding that Monroe's hand numbness was not a severe impairment.

Based on the foregoing, the court finds that substantial evidence supports the ALJ's findings that Monroe's musculoskeletal impairments, leg edema, and hand numbness, were not severe.

**B.    Residual Functional Capacity (RFC) Finding**

An individual's RFC "is the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416,945(a)(1). In order to determine a claimant's RFC, the ALJ must consider "all of the relevant medical and other evidence," and evaluate her "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. §§ 404.1545(a)(3), (4), 416.945(a)(3), (4). The claimant's physical and mental abilities must also be assessed "on a regular and continuing basis." *Id.* §§ 404.1545(b), (c), 416.945(b), (c). This is defined as "[eight] hours a day, for [five] days a week, or an equivalent work schedule." SSR 96-8p, 61 Fed. Reg. 34,474, 34,475 (July 2, 1996).

Monroe argues that the RFC finding is not supported by substantial

evidence. (*See* Dkt. No. 10 at 15-17.) Monroe bases her argument largely on her contention that the ALJ failed to properly evaluate the severity of several of her impairments. (*See generally id.*) However, as previously discussed, the ALJ's severity findings are supported by substantial evidence. The court further finds that the ALJ's RFC determination is also supported by substantial evidence.

The ALJ found that Monroe retained the ability "to perform the full range of light work." (Tr. at 17.) More specifically, the ALJ found that Monroe could

> "lift and/or carry [twenty] pounds occasionally and ten pounds frequently, stand and/or walk for a total of six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, and push and/or pull [twenty] pounds occasionally and ten pounds frequently. She should avoid concentrated exposure to respiratory irritants."

(*Id.*)

The ALJ's findings are supported by the following evidence. The only examining medical sources to provide opinions of Monroe's ability to work despite her impairments, were two state agency medical consultants, Drs. Amatucci and Naughten. Dr. Amatucci examined Monroe in November 2003, and found only that she had a "mild decreased functional capacity regarding heavy work to some extent, and probably the largest extent from today's

11

examination, due to her obesity." (Tr. at 252.) Dr. Naughten examined Monroe in May 2006, and found the following: "[s]he should avoid all known smoke, dust, and respiratory irritants due to her asthma. No limitations to seeing, hearing, talking, sitting, or standing. Mild to moderate limitation walking and climbing stairs. No limitation pushing, pulling, or reaching. Mild to moderate limitation lifting, carrying, and handling objects." (*Id.* at 437.)

The opinions of two state agency disability analysts further support the ALJ's RFC finding. In November 2003, a disability analyst found that Monroe could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had an unlimited ability to push and/or pull, other than as found for lift and/or carry. (*See id.* at 258.) The disability analyst also found no postural, manipulative, visual, or communicative limitations, but opined that Monroe would need to avoid a concentrated exposure of extreme cold, extreme heat, and hazards (including machinery, and heights). (*See id.* at 259-60.) A second disability analyst reviewed the record in June 2006, and found that Monroe could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in

12

an eight-hour workday; and had an unlimited ability to push and/or pull, other than as found for lift and/or carry. (*See id.* at 444.) The analyst further found no postural, manipulative, visual, or communicative limitations, but opined that Monroe would need to avoid a concentrated exposure of fumes, odors, dusts, gases, and poor ventilation. (*See id.* at 445-46.) Based on the foregoing, the court finds that the ALJ's RFC determination is supported by substantial evidence.

## C. <u>Credibility</u>

"[A] claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence." *Simmons v. U.S. R.R. Retirement Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted). "However, the ALJ is 'not obliged to accept without question the credibility of such subjective evidence.'" *Martone v. Apfel*, 70 F.Supp.2d 145, 151 (N.D.N.Y. 1999) (quoting *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). In analyzing credibility, the ALJ must first determine whether the claimant has medically determinable impairments, "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p, 1996 WL 374186, at *2 (1996). Second, if medically determinable impairments are shown, then the ALJ must evaluate the

intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. *See* 20 C.F.R. § 404.1529(c); SSR 96-7p, 61 Fed. Reg. 34,483, 34,484 (July 2, 1996). Because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," SSR 96-7p, 61 Fed. Reg. at 34,485, an ALJ will consider the factors listed in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii)[6] in making her credibility determination.

If the ALJ finds that the claimant's pain contentions are not fully credible, she must state her reasons "explicitly and with sufficient specificity to enable the [c]ourt to decide whether there are legitimate reasons for the ALJ's disbelief." *Young v. Astrue*, No. 7:05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting *Brandon v. Bowen*, 666 F.Supp 604, 608 (S.D.N.Y. 1987)).

Monroe argues that "[t]he ALJ failed to make any credibility finding and failed to properly review [her] subjective allegations." (Dkt. No. 10 at 18.)

---

[6] The listed factors are: (i) claimant's daily activities; (ii) location, duration, frequency, and intensity of claimant's symptoms; (iii) precipitating and aggravating factors; (iv) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (v) other treatment received to relieve symptoms; (vi) any measures taken by the claimant to relieve symptoms; and (vii) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

14

Contrary to Monroe's argument, the ALJ clearly found that her statements were less than fully credible. (*See* Tr. at 19.) The ALJ first noted that Monroe's "subjective complaints of disability when she testified in 2008 were not fully credible." (*Id.*) The ALJ then found that Monroe's "more recent testimony was somewhat inconsistent and included comments regarding symptoms that [we]re not reflected in the medical treatment notes, casting doubt about the credibility of at least some of her statements." (*Id.*)

In making her finding that Monroe's statements were not fully credible, the ALJ discussed several of the relevant factors. (*See id.*) For example, the ALJ considered Monroe's daily activities, her failure to follow a diabetic diet, and that her medications have not caused side effects. (*See id.*) The court acknowledges that the ALJ failed to complete step one of the two-step credibility finding by failing to explicitly state whether Monroe's medically determinable impairments could reasonably be expected to produce her symptoms. (*See id.* at 12-22.) However, despite this failure, the ALJ's credibility analysis remains supported by substantial evidence, and her failure to complete step one amounts to, at most, harmless error. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)) ("Where application of the correct legal standard

15

could lead to only one conclusion, we need not remand.")

**D.     Step Five Finding**

The ALJ found that Monroe could perform the full range of light work, and therefore "a finding of 'not disabled' [wa]s directed by Medical-Vocational Rule 202.21 and 22 and Rule 202.14 and 15 (depending on whether or not [Monroe] had transferable work skills)." (Tr. at 21.) The ALJ also relied upon the testimony of a VE. The VE testified that an individual with Monroe's RFC, "age, educational and vocational history" could perform the jobs of companion, blood donor unit assistant, and assembler. (*Id.* at 21, 741-42.)

Monroe challenges several portions of the ALJ's finding at step five of the sequential evaluation. (*See* Dkt. No. 10 at 18-20.) Monroe first reiterates her previous contentions, that the ALJ failed to properly assess the severity of her impairments and determine the RFC. (*See id.* at 19.) Monroe further argues that because she suffered from non-exertional impairments, the ALJ erred in relying upon the grid guidelines. (*See id.*)

The use of the grid guidelines is inappropriate "where the claimant's work capacity is significantly diminished beyond that caused by h[er] exertional impairment." *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986). "Significantly diminished" means "the additional loss of work capacity beyond

a negligible one or . . . one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 606.

Here, when determining Monroe's RFC, the ALJ found that she "should avoid concentrated exposure to respiratory irritants." (Tr. at 17.) Along with considering the grid guidelines, the ALJ elicited the testimony of a VE. The VE stated that an individual with Monroe's educational-vocational background and RFC could perform several positions, both nationally and locally. (*See id.* at 21, 741-43.) In questioning the vocational expert in this case, the ALJ's hypothetical question accurately reflected her RFC assessment which, as discussed above, was supported by substantial evidence. (*Compare id.* at 741, *with id.* at 17.) As a result, the ALJ was entitled to rely upon the VE's testimony when determining the availability of jobs in the economy.

Accordingly, the ALJ's finding that Monroe could perform a significant number of positions in the economy, is supported by substantial evidence.

## VII. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Monroe's complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this

17

Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

November 21, 2012
Albany, New York

*Gary L. Sharpe*
Chief Judge
U.S. District Court